IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

OCIE L. NORRIS,
     Plaintiff,

vs.                               Case No. 5:06cv135/SPM/EMT

MICHAEL J. ASTRUE,[1]
Commissioner of the
Social Security Administration,
     Defendant.
_____/

## ORDER, REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act").  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

---

[1]Michael J. Astrue succeeded Jo Anne B. Barnhart, and is presently the Commissioner of Social Security. Therefore, he is automatically substituted as Defendant.  *See* Fed. R. Civ. P. 25(d)(1).

I.      PROCEDURAL HISTORY

This suit involves two applications made under the Act.  On October 26, 2001, Plaintiff applied for DIB under Title II of the Act (Tr. 117–20)[2] and SSI based on disability under Title XVI of the Act (Tr. 416–18).  Plaintiff's applications were denied initially (Tr. 106–08, 413–15) and on reconsideration (Tr. 100–03, 409–12).  On April 8, 2004, following a hearing, an administrative law judge ("ALJ") rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act (Tr. 16–30).  On March 31, 2006, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 5–7).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).  This appeal followed.

II.     FINDINGS OF THE ALJ

On April 8, 2004, the ALJ made several findings relative to the issues raised in this appeal (Tr. 19–30):

1)      Plaintiff meets the nondisability requirements for a period of disability and DIB set forth in section 216(i) of the Act and is insured for benefits through April 8, 2004, the date of the ALJ's decision.

2)      Plaintiff has not engaged in substantial gainful activity since August 30, 2001, the alleged onset of disability.

3)      Plaintiff's coronary atherosclerotic heart disease, hypertension, chronic neck and back pain, status post left rib contusion, degenerative disc disease, status post bronchitis, and major depressive disorder, recurrent, are considered "severe" based on the requirements in the Regulations (20 C.F.R. §§ 404.1520(c) and 416.920(b)).[3]

4)      These medially determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

---

[2]All references to "Tr." refer to the Transcript of Social Security Administration Record filed on September 28, 2006 (Doc. 15).

[3]In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims (see 20 C.F.R. §§ 404, 416).  Therefore, hereafter, citations in this report and recommendation should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

5)      Plaintiff's allegations regarding her limitations are not totally credible.

6)      Plaintiff has the residual functional capacity ("RFC") to perform light work, and she has no restrictions and limitations in her mental abilities to do basic work activities.

7)      Plaintiff's past relevant work as a short-order cook, cashier checker, and waitress and counter attendant/server did not require the performance of work-related activities precluded by her RFC (20 C.F.R. § 404.1565).

8)      Plaintiff's medically determinable impairments do not prevent her from performing her past relevant work.

9)      Plaintiff was not under a "disability" as defined in the Act, at any time through April 8, 2004, the date of the ALJ's decision (20 C.F.R. § 404.1520(e)).

(Tr. 29).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.

2d 842 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A.    Personal History

Plaintiff testified at a hearing before the ALJ as follows. She was born on August 26, 1948, was 55 years old at the time of the hearing, and completed school through only the eighth grade and was in special classes (Tr. 34–35, 155 (DIB report)). Her past work experience includes employment as a snack-bar attendant, waitress, cook, housekeeper, and oyster shucker (Tr. 36–42, 63–64, 124 (work history report), 140 (same)). She alleges that she became disabled on August 30, 2001, due to chronic obstructive pulmonary disease ("COPD");[4] a degenerative back disease; pinched nerves; arthritis; high blood pressure; ulcers; chest, left arm, back, right hip, and right knee pain; fatigue; depression; spleen problems; and mini-strokes (Tr. 42, 44–45, 115 (amendment to DIB application identifying August 30, 2001 as the date Plaintiff became disabled)).

Plaintiff testified that she last worked in August 2001 (Tr. 36). She worked about thirty hours a week as a waitress (Tr. 56–57). She stated she has high blood pressure and pain in her arms and legs (Tr. 42). In addition she has COPD, chronic bronchitis, angina, and emphysema (Tr. 44). Plaintiff also testified that her back "goes out," and her bones are very fragile (Tr. 44–45). She stated that if she is moving around she can stand for about twenty to thirty minutes, and she can sit for about the same amount of time (Tr. 42–43). She further stated that she has a "severe" case of depression and tried to commit suicide several times (Tr. 45–46). She testified that she takes

---

[4]COPD is comprised primarily of two related diseases: chronic bronchitis and emphysema. *See, e.g.*, http://www.medicinenet.com/chronic_obstructive_pulmonary_disease_copd/article.htm (last visited June 12, 2007). "In both diseases, there is chronic obstruction of the flow of air through the airways and out of the lungs, and the obstruction generally is permanent and progressive over time." *Id.*

Wellbutrin but has not undergone mental health treatment because she cannot afford it (*see* Tr. 46, 50).  Plaintiff testified that her depression made her cry a lot at work and to sometimes go home early (Tr. 46).  She testified that stress affects her depression (Tr. 61).  She also testified that she was hospitalized for and receives treatment for high blood pressure and chest pain (Tr. 51–52).  She said that she has been to the hospital four times in the last year for chest pain (Tr. 60).

Plaintiff noted that she has shortness of breath and "get[s] out of breath" easily (Tr. 57).  She also testified that she smokes a half a pack of cigarettes a day but is trying to quit (Tr. 49, 55).  When she worked as a housekeeper, chemicals affected her ability to work, and she had difficulty working in the heat and dust (Tr. 57–58).  As a result, she had to take fifteen-minute breaks (Tr. 58).  In addition, she noted that the pain in her low back and neck bothers her when she bends over (*id.*).  She said that her neck, shoulder, and fingertips sometimes become numb (Tr. 58).  On a scale of 1 to 10, she said her pain level was about a 5 or 6, and if she does a lot of walking it is "maybe a 9" (*id.*).  Plaintiff testified that physical activity exacerbates her pain (*id.*).

With regard to activities of daily living, Plaintiff testified that she cannot stand or sit for longer than about twenty to thirty minutes without needing to move around (Tr. 43).  She said she can walk "around the block," which takes about thirty minutes, and she does this once a week for exercise (*id.*).  She testified that she can lift up to fourteen pounds (Tr. 44).  Plaintiff said she arises at 5:00 a.m. and washes clothes for her husband to hang out (Tr. 52).  She performs "a little bit" of housework, with some cooking and dusting (*id.*).   Her husband does most of the vacuuming, and she does the dishes (Tr. 52–53).  She watches TV, plays solitaire, and goes to bingo which lasts an hour (Tr. 53).  She reads "a little" and likes to do yard work but is unable to do it (*id.*).  She goes shopping once in a while and sometimes goes to the movies (Tr. 54).  Plaintiff also goes fishing with her husband once or twice a year from the river bank or from a bridge (*id.*).[5]

Finally, Plaintiff's file contains an untitled disability report that indicates Plaintiff can walk up to two blocks slowly or a half a block quickly (Tr. 139).  The report also indicates that Plaintiff has discomfort in her chest, including squeezing, pressure, shortness of breath, weight on her chest, and flutter which starts in her neck, arms, shoulders, and throat (*id.*).   Her chest discomfort is

---

[5]In July 2001, Plaintiff reported to a physician that "she enjoys fishing, camping, and gardening" (*see* Tr. 204).

brought on by stress or overexertion (*id.*).  Another disability report form indicates Plaintiff's belief that her conditions affect her ability to work because lifting and bending cause her blood pressure to go up, which causes chest pain (Tr. 149).  She states that she cannot work because of chest pain and pain in her left arm, back, right hip, and knee (*id.*).

B.    Relevant Medical History

Records beginning in 1990 from the Jackson County Public Health Department indicate that as early as November 1994, Plaintiff was advised by J. Giraldo, M.D., to stop smoking (Tr. 256, 242–63).

On August 29, 1995, Plaintiff presented to Dr. Giraldo complaining of depression, fatigue, and irritation during urination (Tr. 256).  Notes reflect that she was taking no blood pressure medication and was a heavy smoker (*id.*).  Plaintiff said she was crying often, had no interest in performing things she used to enjoy, was not eating or sleeping well, and had no current suicidal ideas but did so in the past (*id.*).  She had been prescribed blood pressure medication in the past but could not afford it at present (*id.*).  Dr. Giraldo diagnosed bacterial vaginosis, questionable diverticulitis, and "anxiety depression" (*id.*).  He prescribed Norvasc, MetroGel Vaginal, Doxycycline, and Zoloft (*id.*).  He also instructed Plaintiff to stop smoking (*id.*).

On February 18, 1997, Plaintiff returned to Dr. Giraldo with neck, left shoulder, and arm pain (Tr. 250–52).  Dr. Giraldo noted that she had not taken her blood pressure medication since April 1996 because she had no money to purchase the medication (Tr. 252).  Dr. Giraldo's assessment was hypertension with poor control secondary to noncompliance, alcohol abuse ("weekend drinker"), and degenerative joint disease of the cervical spine and left shoulder (Tr. 251).  Plaintiff was administered blood pressure medication and her pressure, checked in intervals, was found to be abnormally high (*id.*).  She was given Procardia, but her blood pressure remained elevated (Tr. 250).  Plaintiff was allowed to leave the clinic, and as she departed she said she felt "good" (*id.*).

On April 30, 1998, an MRI of Plaintiff's cervical spine showed an extradural defect at C6-7 on the left (Tr. 371).  The findings were consistent with bony bar formation and cervical spondylosis (*id.*).  An MRI of Plaintiff's lumbar spine showed no evidence of disc herniation, minimal bulging of the L3-4 discs, and mild facet arthropathy bilaterally at the L4-5 and L5-S1 levels (Tr. 372).

Plaintiff presented to Nikorn Arunakul, M.D., on December 1, 1998, with complaints of cold symptoms, bronchitis, pharyngitis, upper respiratory infection, and high blood pressure (Tr. 193). Plaintiff was instructed to stop smoking, given a prescription for Amoxil, Rynatan, Phenergan, and Adalat, and asked to return in four weeks for follow-up (*id.*).

On January 8, 1999, Plaintiff again saw Dr. Arunakul (Tr. 190).  She complained of back pain, a hurt shoulder, and chronic scoliosis of the back (*id.*).  Dr. Arunakul noted that Plaintiff tried to stop smoking and now gets nervous (*id.*).  Dr. Arunakul prescribed Naprosyn, Darvocet, Zyban, Apresoide, and Adalat, and he requested that Plaintiff return in four weeks (*id.*).

On January 28, 1999, Plaintiff returned to Dr. Arunakul with more complaints of shoulder pain (Tr. 188).  Dr. Arunakul prescribed Lortab, Zantac, and Zyban (*id.*).  On February 17, 1999, Plaintiff presented to Dr. Arunakul with cold-like symptoms and was given Amoxil and Rynatan (Tr. 185).

On March 11, 1999, Plaintiff presented to Dr. Arunakul with complaints of left jaw, chin, and neck pain (Tr. 182).  Plaintiff also requested medication to help her stop smoking (*id.*).  Dr. Arunakul prescribed Ceftin, Darvocet, and Wellbutrin (*id.*).  On May 7, 1999, Plaintiff returned with complaints of cold, cough, pharyngitis, bronchitis, and nasal congestion (Tr. 179).  Dr. Arunakul prescribed Rynatan, Biaxin, and a nasal spray (*id.*).

On July 18, 1999, Plaintiff was admitted to the hospital due to complaints of chest pain (Tr. 164, 162).  Dr. Arunakul's impression was "anxiety chest pain," epigastric discomfort, history of hypertension, and "history of emphysematous lung, heavy smoker" (*id.*).

On September 18, 1999, Plaintiff presented to Dr. Arunakul for an outpatient endoscopic photo-biopsy (Tr. 369).  The biopsy showed Plaintiff to have "healing peptic duodenal, hiatal hernia and reflux" (Tr. 368).  Dr. Arunakul's impression was hiatal hernia reflux, peptic ulcer disease, history of hypertension, tobacco abuse, and emphysematous lungs (*id.*).  He also noted that she was a heavy smoker and had hypertension (*id.*).  Plaintiff was continued on her existing medications (*id.*).

On October 29, 1999, Plaintiff presented to Dr. Arunakul with complaints of cold, cough, and bronchitis (Tr. 174).  Dr. Arunakul noted that Plaintiff was a heavy smoker and was in poor

health because of COPD and smoking (*id.*).  Plaintiff was given a prescription for Phenergan, Entex, and Biaxin (*id.*).  Plaintiff was also given a work-excuse for two days off of work (*id.*).

On May 31, 2000, a chest x-ray showed no cardiac, mediastinal, or bony thoracic abnormalities (Tr. 365).  Dr. Arunakul noted that as compared to a July 1999 x-ray, the lungs remained clear (*id.*).

Medical records from Jackson Hospital show that Plaintiff was hospitalized from June 30, 2001 to July 2, 2001 (Tr. 196).  James K. Gordon, M.D., reported that Plaintiff presented with intermittent chest pain which was substernal and tight for two days, and she had been under a lot of stress at work (Tr. 197).  He noted she had an angioplasty for arteriosclerotic heart disease five years earlier (*id.*).  Plaintiff also had hypertension but had not followed up with her doctor, was noncompliant with her medicine, and abused tobacco (*id.*).  Although Plaintiff was quite anxious, cardiac isoenzymes were negative and EKGs were normal, except for waves in V2 (Tr. 196).  Plaintiff's final discharge diagnosis was chest pain, probably angina, arteriosclerotic heart disease, post angioplasty, hypertension, anxiety, medical noncompliance, and tobacco abuse (Tr. 198).  She was treated with oxygen and bed rest, placed on nitroglycerin paste, started on aspirin, and given a cardiac consult (*id.*).  Upon discharge, Plaintiff was free of chest pain, and her vital signs were stable (*id.*).

On July 20, 2001, Plaintiff presented to Michael Stokes, M.D., for a cardiac evaluation (Tr. 204).  Dr. Stokes reported that Plaintiff had a history of hypertension and hyperlipidemia (*id.*).  A cholesterol draw on June 30, 2001, revealed a total cholesterol of 212 (LDL 80, HDL 55, triglycerides 387) (*id.*).  Dr. Stokes explained that Plaintiff had a cardiac catheterization on September 9, 1999, revealing a twenty percent osteal narrowing of the left main coronary artery and a thirty percent narrowing of the proximal right coronary artery (*id.*).  Her left ventricle hypertrophy had a normal ejection fraction and she was treated medically (*id.*).  Near the end of June 2001, she reported having discomfort in her chest going up into her jaw and down her left arm brought on by physical activity (*id.*).  She presented to the emergency room, but blood work showed no abnormalities (*id.*).  She noticed dyspnea with exertion and that her heart occasionally "skip[ped] a beat" (*id.*).  She also reported working "hard all day cooking and standing and once she gets home she is pretty sedentary" (*id.*).  Dr. Stokes's impression was atherosclerotic coronary artery disease,

hypertension, hyperlipidemia, gastroesophageal reflux disease, peptic ulcer disease, chronic bronchitis caused by smoking, and arthritis (Tr. 204–05).  He advised her to stop smoking and suggested that she add baby aspirin to her medications (Tr. 205).

On August 16, 2001, Thompson C. Maner, M.D., performed a cardiac ultrasound (Tr. 202). The interpretation revealed that Plaintiff's aortic root dimensions were normal, and the aortic valve was anatomically unremarkable (*id.*).  Left atrial dimensions were normal; the mitral and tricuspid valves were anatomically unremarkable; the left ventricular dimensions, wall thickness and systolic function were normal with the estimated ejection fraction being sixty-five percent; right heart dimensions were normal; there was an unremarkable doppler of the pulmonic valve; and no pericardial effusion was observed (*id.*).

On August 17 and 24, 2001, pharmacological nuclear stress testing was performed (Tr. 201). The tests showed overall ejection fraction at stress and rest within reasonable limits of normal (*id.*).

On September 14, 2001, Plaintiff returned to Dr. Stokes for follow-up (Tr. 205).  He noted that she had not been taking her medications, had not followed up with her primary physician (Dr. Gordon), and had not quit smoking (*id.*).  Dr. Stokes assessed coronary atherosclerotic heart disease with possible progression (*id.*).  He restarted her medications, and encouraged her to eat a low-fat diet and quit smoking (*id.*).  Dr. Stokes also indicated that he would see Plaintiff if she was not willing to return to Dr. Gordon (*id.*).

On October 11, 2001, Dr. Stokes performed a coronary arteriography and left ventriculography (Tr. 206).  Dr. Stokes's impression was left main coronary artery with no significant obstructive stenosis, left anterior descending coronary artery with plaquing and luminal irregularities but no significant obstructive stenosis, and right coronary artery with plaquing and luminal irregularities but no significant obstructive stenosis (*id.*).  A left ventriculogram demonstrated reasonable contractility and no significant wall motion abnormality (*id.*).  The overall ejection fraction was estimated to be fifty-five percent, and the left ventricular and diastolic pressure was 10 mm Mercury (*id.*).  Dr. Stokes stated that Plaintiff was without any evidence of obstructive coronary atherosclerotic heart disease (Tr. 207).

On October 15, 2001, Plaintiff presented to Dr. Giraldo due to depression because she was going through a divorce and had not been able to sleep well (Tr. 249).  Dr. Giraldo diagnosed her

with severe situational depression and tobacco abuse (*id.*).  He prescribed Nitro-Tab and Prozac, and he continued her Nitroglycerine, Transderm, Accupril, Pravachol, and aspirin (*id.*).

On October 22, 2001, Plaintiff returned to Dr. Giraldo with complaints of pain and spasms on the left side of her shoulder and arm (Tr. 247).  He prescribed Flexeril (*id.*).

On January 30, 2002, Plaintiff presented to Dr. Giraldo complaining of pain in her joints, especially around the hands, knuckles, wrists, and elbows (Tr. 246).  She was diagnosed with osteoarthritis (*id.*).  Dr. Giraldo prescribed Nicoderm (to help her quit smoking), Prozac, Arthrotec, and Misoprostol (*id.*).

On February 1, 2002, Plaintiff went to an emergency room complaining of left rib pain (Tr. 354).  Plaintiff reported that she felt something pop when she was moving a five-gallon bucket of ice (*id.*).  A chest x-ray showed old rib fractures, deformities on the left, and possibly "an occult acute fracture, but [no] pulmonary contusion, pneumothorax, or hemothorax" (Tr. 358).  The physician also noted that Plaintiff's lungs appeared somewhat overinflated, but her heart was not enlarged (*id.*).  COPD and/or age-related emphysema were noted, with mild pulmonary interstitial and pleural fibrosis (*id.*).  Plaintiff was discharged and prescribed Celebrex and Lortab to be used as needed (Tr. 362).  Plaintiff was also advised to wear a rib belt as needed (*id.*).

On March 22, 2002, Plaintiff presented to the emergency room with a laceration below her left eye (Tr. 348).  She was discharged with a prescription for Darvocet and instructed to apply antibiotic ointment over the area twice a day (*id.*).

On April 11, 2002, Lawrence V. Annis, Ph.D., performed a consultative psychological evaluation (Tr. 209–12).  Plaintiff informed Dr. Annis that her primary problem was "My blood pressure goes up.  I get all tense.  I have chest pains from the angina.  Worrying about everything." (Tr. 209).  Dr. Annis reported that Plaintiff walked and moved slowly and appeared tense; she often shook her head in a nervous manner, but muscle tremor was otherwise absent (Tr. 210).  Plaintiff had no apparent difficulties in posture, gait, or coordination (*id.*).  Her mood was depressed and anxious (*id.*).  She reported that she was worried most of the time and had been for years (*id.*).  Suicide ideation and a suicide attempt were reported, but Plaintiff denied any current plans to harm herself (Tr. 210–11).  Dr. Annis diagnosed major recurrent depressive disorder (Tr. 211).  Dr. Annis explained that Plaintiff's feelings of vulnerability and insecurity became worse during several poor

relationship choices, and her anxiety and depression had become more serious with the onset of protracted physical problems, chronic physical discomfort, and the resulting physical limitations they impose (*id.*).  He also noted that despite the depression, Plaintiff appears able to do basic homemaking chores "but needs assistance meeting demands that require physical strength and stamina" (*id.*).  Dr. Annis opined that Plaintiff was socially handicapped by depression and anxiety (*id.*).  He also found evidence that "occupational achievement is impeded" by her depression and associated anxiety, and he opined that if Plaintiff's physical condition permits work, she would require more encouragement than most people when encountering work difficulties or social challenges (Tr. 211–12).  She would not do well in occupations requiring frequent social interaction, "such as waitress, cashier, or sales clerk" (Tr. 212).  She would likely do better in vocations that deal mostly with things, "such as dish washer, data entry operator, or cleaner" (*id.*).

On April 15, 2002, Plaintiff presented to Muhammad Naeem, M.D., for a consultative physical examination (Tr. 213–15).  Dr. Naeem reviewed Plaintiff's medical history in some detail (Tr. 213).  On examination, he found Plaintiff positive for "off and on chest pain," but he noted that Plaintiff had no shortness of breath, orthopnea, or "PND" (Tr. 214).  He found her heart, lungs, back, and extremities essentially normal (*id.*).  He also noted full range of motion in all joints (*id.*).  He assessed chronic neck and back pain, history of arthritis, history of degenerative joint disease, chest pain (off and on) with a negative cardiac work-up, history of gastroesophageal reflux disease and hiatal hernia, history of hypertension, history of hyperlipidemia, and history of depression (Tr. 215).  Dr. Naeem opined that "She certainly has multiple ongoing medical problems which require constant medical attention.  Although, I did not see limitations in her day to day physical activities." (*id.*).

On May 29, 2002, Plaintiff returned to Dr. Giraldo with complaints of cold-like symptoms (Tr. 244).  He noted that Plaintiff indicated she had quit smoking (*id.*).  Dr. Giraldo also noted that Plaintiff had mild COPD (*id.*).  Dr. Giraldo suspected rhinosinusitis and placed Plaintiff on Bactrim DS and Vicodin; he also asked her to return in one month (*id.*).

On August 8, 2002, Plaintiff returned to the emergency room after falling down (Tr. 333, 343).  The discharge report indicates that Plaintiff's rib was broken (Tr. 343).  She was prescribed Lortab for pain and discharged with instructions to return in three to five days (*id.*).

On August 17, 2002, Plaintiff presented to the emergency room with bronchitis and gastroenteritis (Tr. 326).  The treating physician prescribed Keflex, Phenergan, and Lomotil; he also instructed Plaintiff to return for follow-up in two to five days (*id.*).

On September 10, 2002, Plaintiff presented to John A. Spence, M.D., with complaints of chest pain, fever, and left flank pain (Tr. 264–68).  Plaintiff was admitted to the hospital and was not discharged until September 16, 2002 (*see* Tr. 265).  Dr. Spence observed that Plaintiff had mild shakiness and tenderness in the left flank extended around the general area of her spleen (Tr. 268).  An EKG revealed normal sinus rhythm with no acute changes, depressions, or elevations, and some apparent left-sided crackles with deep inspiration (*id.*).  Dr. Spence prescribed Doxycycline and continued her current medications (*id.*).  He felt that Plaintiff's symptoms indicated she probably had pneumonia, possibly atypical with some pleurisy (*id.*).  At discharge, Plaintiff was continued on Levaquin, and Flagyl was added (Tr. 266).  Dr. Spence opined that Plaintiff may have some splenic infarction and asked her to follow-up in one week (*id.*).

On October 8, 2002, Plaintiff again presented to the emergency room, this time complaining of pain on her right side (Tr. 315).  She reported that she felt something "pop" while she was moving furniture (*id.*).  X-rays of her right ribs showed many old fractures but no definite evidence of an acute fracture (Tr. 312).  COPD was noted as "suspected," with mild pulmonary interstitial and pleural fibrosis (*id.*).  She was discharged with a prescription for Naproxen and Tylox (Tr. 310).

On October 17, 2002, Plaintiff returned to Dr. Spence (Tr. 383).  He reported that Plaintiff went to the emergency room with painful ribs caused by an injury she sustained while trying to move a couch (*id.*).  Plaintiff also complained of cold symptoms and a cough (*id.*).  Dr. Spence assessed chronic bronchitis and "h/o splenic infarction" (Tr. 384).  He prescribed Doxycycline and Splenic, and provided samples of Accupril and Pancof HC for cough (*id.*).

On October 28, 2002, Plaintiff was hospitalized for two days and treated by Dr. Spence for an acute onset of sharp chest pain, which radiated into her jaw and upper arms (Tr. 298–301).  She reported approximately six to seven episodes over the last week, but had not been taking her aspirin and had not been on the nitroglycerin patch previously prescribed (Tr. 298).  Chest x-rays showed some hyperinflation, and an EKG revealed sinus rhythm with short PR interval and no ST abnormalities (Tr. 299).  During the course of her hospitalization, Dr. Spence placed Plaintiff

initially on a nitroglycerin drip for chest pain, which was effectively decreased rather rapidly with the addition of the nitroglycerin patch (Tr. 292).   In addition to the patch, Plaintiff was placed on Accupril, Pravachol, aspirin, Prozac, and Morphine for severe pain (Tr. 299).  EKGs preformed on October 29, 2002 were essentially normal (Tr. 294–95).  Finally, on October 29, 2002, Plaintiff was discharged with a prescription for a nitroglycerin patch, aspirin, Prozac, Pravachol, and Accupril (Tr. 292–93).  She was instructed to follow-up with Dr. Spence in two to three weeks (Tr. 293).

At Dr. Spence's request, Nelson Gwinn, M.D., performed a consultative examination of Plaintiff on October 28, 2002 (Tr. 296–97).  Dr. Gwinn observed that Plaintiff was a healthy female in no apparent distress, and her physical examination was unremarkable (Tr. 297).  Dr. Gwinn noted that Plaintiff previously had a cardiac catheterization and multiple trauma, which precipitated much of her chest discomfort (Tr. 296).  Dr. Gwinn reported that Plaintiff had not been taking her Prozac or using her Combivent inhaler (*id.*).  Dr. Gwinn's impression was depression, hypertension (intermittent and low), elevated cholesterol, "some bad lungs and asthma," and peptic ulcer disease (*id.*).  Dr. Gwinn concurred with the current medical therapy and recommended a stress thallium or stress echo (Tr. 297).  Dr. Gwinn also recommended that Plaintiff's Prozac be restarted because "she seems certainly anxious" (*id.*).

On November 12, 2002, Plaintiff presented to Dr. Spence and reported that she slipped on some grease and fell against a microwave cart (Tr. 382).  Plaintiff had a raised, red, swollen area on the right side of her upper back (*id.*).  Dr. Spence observed that she appeared in no acute distress, her gait and station were normal, and she walked with a limp (*id.*).  He assessed dizziness appurtenant to the slip and fall injury (Tr. 382–83).  He prescribed Lortab and Miclizine for dizziness and added HCTZ for blood pressure (Tr. 379).

On November 14, 2002, Plaintiff returned to the emergency room with complaints of left shoulder strain and bronchitis (Tr. 307).  Plaintiff reported extreme pain in her right shoulder blade due to a fall about three days earlier (*see* Tr. 304–05).  She was given a prescription for Darvocet and Flexeril and discharged with instructions to return for follow-up in a week (Tr. 307).

On February 10, 2003, Dr. Spence noted that Plaintiff called him regarding problems with her spleen (Tr. 379).  Dr. Spence called in a prescription for Splenic (*id.*).

On February 11, 2003, an ultrasound of Plaintiff's spleen showed no significant changes since the last study (Tr. 301). The technician noted that the spleen is acoustically heterogeneous, and the findings correspond to those made after the September 2002 ultrasound and CT scan (*id.*).

On April 23, 2003, Plaintiff presented to Dr. Spence complaining of right leg, knee, and side pain (Tr. 378–79). Plaintiff reported that she felt a "pop" in her shoulder when she was picking up a laundry basket (Tr. 378). Dr. Spence also noted that she was coughing quite a bit (*id.*). He assessed depression, fever, chest discomfort, and shoulder pain (Tr. 376). Dr. Spence prescribed Lortab, Celebrex, and changed her Prozac to Lexapro because Plaintiff complained that the Prozac was not working (*id.*).

On April 28, 2003, Dr. Spence completed a "sedentary requirements checklist" and a "physical capacity evaluation" (Tr. 373–75). Dr. Spence opined that Plaintiff could utilize both hands and feet in fine manipulation, lift five pounds on a repeated basis, lift or carry ten pounds occasionally, stand or sit up to three hours in an eight-hour workday, and walk short distances (*id.*). Plaintiff's medical condition did not require the use of a hand-held assistive device for even occasional walking or standing (*id.*). Dr. Spence stated that Plaintiff did not have a non-exertional impairment which had a neurological, psychological, allergenic, respiratory, or environmental restriction associated with it or in which pain, fatigue or intelligence substantially restricted Plaintiff's ability to function (Tr. 373).

On May 2, 2003, x-rays of Plaintiff's right shoulder showed degenerative changes but no fracture or dislocation (Tr. 386). No sign of an acute injury or active disease was noted (*id.*). Dr. Spence noted that Plaintiff appeared normal and was in no acute distress (Tr. 388). He assessed hypertension and right shoulder pain (*id.*). He injected Plaintiff's right shoulder with 2 cc of lidocaine and 1 cc of Kenalog (*id.*).

On May 22, 2003, Plaintiff returned to Dr. Spence (Tr. 389). He noted that Plaintiff had a rash on her forehead (Tr. 390). Plaintiff had been out in the "garden pulling weeds" when the rash started (*id.*). No chest pain, heart problems, or breathing problems were noted, but general aches and pains were noted (*id.*). Dr. Spence assessed hypertension and dermatitis contact with plants (*id.*). He prescribed Zyrtec, Atarax, triamcinolone acetonide (nasal spray), and lisinopril (*id.*). On

May 23, 2003, Plaintiff returned because the rash was spreading (Tr. 392).  Dr. Spence prescribed Prednisone and continued her Atarax (*id.*).

On October 8, 2003, Plaintiff was admitted to the hospital with Dr. Spence attending (Tr. 402–04).  The diagnosis upon admission was hypertensive urgency with resulting chest pain (Tr. 403).  Dr. Spence reported that Plaintiff smoked a pack of cigarettes a day, drank one to two drinks at night, and was mildly obese (Tr. 402).  He also noted that Plaintiff's drug screen was positive for barbiturates, tricyclics, and THC, although Plaintiff did not report any recent use of these substances (Tr. 403).  Dr. Spence suspected that possible withdrawal could be a contributing factor to her severe hypertension which then resulted in chest pain (*id.*).  He discussed these factors with Plaintiff, but she declined any counseling or referral for therapy (Tr. 399).  Upon examination, Dr. Spence observed that Plaintiff was alert and oriented with no limitation of range of motion, and there were no signs of depression or anxiety (Tr. 403).  Dr. Spence opined that given Plaintiff's chest pain, he ruled out cardiac ischemia, and he opined that her abdominal swelling was simply obesity (*id.*).  She was treated with a nitroglycerin patch and drip, in addition to her normal Ace inhibitor dosing, and was placed on Toprol XO (Tr. 399).  By the next morning, Plaintiff was able to be taken off the nitroglycerin drip and was stable on oral medications only (*id.*).  The discharge diagnosis was resolved hypertensive urgency, no evidence for cardiac ischemia, and polysubstance abuse positive for barbiturates, THC, and tricyclics (*id.*).  Dr. Spence remarked that the positive drug screen was surprising and unexpected (Tr. 403).  Plaintiff was discharged with prescriptions for Accupril, Nitroglycerine patch, Toprol XL, aspirin, Pravachol, Ultram, and extra-strength Tylenol (Tr. 400).

On November 17, 2003, Dr. Spence ordered an MRI of the cervical spine (Tr. 396–97).  The MRI revealed mild cervical spondylosis, with no sign of fracture or luxation and no intervertebral disc herniation, but mild bulging at C3-4, followed by C4-5 and C5-6, with no spinal stenosis or cervical cord myelopathy (Tr. 396).

C.      Other Information Within Plaintiff's Claim File

Psychologist William Himadi, Ph.D., completed Psychiatric Review Technique forms on April 30, 2000 (Tr. 277–90).  Dr. Himadi opined that Plaintiff's impairments were not severe (Tr. 277).  He diagnosed Plaintiff with depressive disorder, not otherwise specified (Tr. 280).  Her functional limitations were noted as "mild" for restriction of activities of daily living, difficulties

in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace (Tr. 287).  No episodes of decompensation were noted (*id.*).  Dr. Himadi indicated that Plaintiff had a depressive mood, but no other significant issues were noted (Tr. 289).  "There appear to be no significant psychological issues precluding [Plaintiff] from working" (*id.*).

Psychologist T. Wayne Conger, Ph.D., completed Psychiatric Review Technique forms and a Mental RFC Assessment on April 22, 2002 (Tr. 216–33).  Dr. Conger stated that Plaintiff was physically limited to some extent, but she was mentally capable of performing routine jobs and was currently working part-time (Tr. 228).  He stated that although she may experience some depression related to her condition, she can relate in a socially appropriate manner and she displays an adequate mental status (*id.*).  He opined that there was no indication of a mental impairment that would meet or equal any listing (*id.*).  Her functional limitations were noted as "mild" for restriction of activities of daily living and difficulties in maintaining social functioning; "moderate" in difficulties in maintaining concentration, persistence, or pace; and "none" in episodes of decompensation (Tr. 226).  The only mental limitation noted by Dr. Conger was a "moderate" limitation in Plaintiff's ability to maintain attention and concentration for extended periods; in all other areas she was "not significantly limited" (Tr. 230–31).  Dr. Conger's diagnoses were depressive disorder, not otherwise specified, and anxiety disorder, not otherwise specified (Tr. 219, 221, 228).

Todd Patterson, D.O., completed a Physical RFC Assessment on May 20, 2002 (Tr. 234–41).  He opined that Plaintiff was able to frequently lift or carry ten pounds, occasionally lift or carry twenty pounds, and she could stand, walk, or sit six hours in an eight-hour workday (Tr. 235).  Her ability to push or pull was unlimited (*id.*).  Plaintiff was occasionally able to stoop, kneel, crouch and crawl, and frequently able to balance and climb, but never able to climb ladders, ropes, or scaffolds (Tr. 236).  Additionally, Plaintiff was to avoid hazardous machinery but otherwise had no environmental limitations (Tr. 238).  Finally, no manipulative, visual, or communicative limitations were established (Tr. 237–38).

J. Patrick Neal, M.D., FACS, completed a Physical RFC Assessment on September 27, 2002 (Tr. 269–76).  According to Dr. Neal, Plaintiff was able to lift or carry fifty pounds occasionally and twenty-five pounds frequently, and she could sit, stand, or walk six hours in an eight-hour workday (Tr. 270).  Her ability to push or pull was unlimited (*id.*).  No postural, manipulative, visual, or

communicative limitations were established (Tr. 272–73).  Plaintiff was to avoid concentrated exposure to extreme cold, heat, wetness, humidity, noise, vibration, fumes, and hazardous machinery (Tr. 273).

At the hearing before the ALJ on December 3, 2002, a vocational expert ("VE") testified (Tr. 62–72).  The VE testified that a person with Plaintiff's past work experience, who could sit or stand six hours in an eight-hour workday, lift twenty pounds occasionally and ten pounds frequently, and who could not work at heights or do any climbing, would be able to return to Plaintiff's past employment as a short-order cook or waitress (Tr. 67).  Further, the VE testified that a person with Plaintiff's past work experience, who could sit about six hours and stand about four hours in an eight-hour workday, and lift up to ten pounds, but who could not work at heights, would be able to work as a cashier at the movies or in parking lots (Tr. 68).  The VE also testified that there were no semiskilled sedentary jobs Plaintiff could perform without a finding regarding transferable skills, but the VE noted that Plaintiff could return to work as a short-order cook without a finding regarding transferable skills (*see* Tr. 69–70).  Finally, the VE testified that, assuming an individual of the same age; education; prior work history; who can utilize both of her hands in fine manipulation; stand or walk three hours and sit three hours in a normal workday; lift up to ten pounds occasionally; and use her hands and feet for repetitive tasking such as grasping, pushing, and pulling, would be disabled because "a person that cannot work an eight-hour day (inaudible) full-time basis . . . [is] disabled . . . and there's a ruling that addresses that" (Tr. 71).

V.      DISCUSSION

Plaintiff raises three[6] arguments on appeal: (1) the ALJ improperly discounted the opinion of, and failed to recontact, Plaintiff's treating physician Dr. Spence, (2) the ALJ improperly discounted the opinion of Dr. Annis, and (3) the ALJ's determination of Plaintiff's RFC did not properly take into account Plaintiff's symptoms of depression and is not supported by the relevant medical evidence (Doc. 19 at 14–19).

A.      Discounting the Opinion of and Failing to Recontact Dr. Spence

Plaintiff argues that the ALJ improperly discounted the opinion of Dr. Spence, a treating physician (Doc. 19 at 17–18).   In particular, Plaintiff contends that Dr. Spence indicated that Plaintiff was "unable to sustain activity at the pace and with the attention to task required in the competitive workplace" (Doc. 19 at 17).   Plaintiff further states that Dr. Spence limited her to "standing/walking three hours total in an 8-hour workday, and sitting three hours total" (*id.*). Plaintiff also notes Dr. Spence's finding that she was "unable to sit six hours in a normal position, but she is able to use her hands for fine manipulation, lift ten pounds, stand two hours, and walk short distances" (*id.*).   Plaintiff generally alleges the ALJ erred in discounting these opinions (*id.* at 18).   More specifically, Plaintiff alleges the ALJ erred by discounting his opinions merely as "not supported by objective medical findings" without providing a detailed explanation of his reasons (*id.* at 18).   Further, Plaintiff contends, if the ALJ did not "believe Dr. Spence's opinion was based on 'medically acceptable clinical and laboratory diagnostic techniques,'" the ALJ was "<u>required</u> by the [] regulations to re-contact Dr. Spence for clarification of his statements" (*id.*) (emphasis in original).   In response, the Commissioner argues that the ALJ properly discounted Dr. Spence's opinion because it was contrary to his own progress notes and other objective medical evidence in the record (Doc. 22 at 5).   Moreover, because the ALJ properly discounted Dr. Spence's opinion, the Commissioner asserts that the ALJ was not required to recontact Dr. Spence (Doc. 22 at 6).

---

[6]Plaintiff breaks her argument into four sections labeled parts V(A), (B), (C), and (D) (*see* Doc. 19 at 14, 15, 16, 18).   In parts V(A) and (D), Plaintiff alleges that the ALJ erred in determining her RFC (*see id.* at 14–15, 18–20). For organizational purposes, the court has grouped Plaintiff's arguments regarding the RFC determination into one section.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis, 125 F.3d at 1439–41; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Commissioner of Social Security,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner.

20 C.F.R. § 404.1527(e).  The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims.  The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner.  For instance, 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion.  Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner.  20 C.F.R. § 404.1527(e)(3); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").  Although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record.  SSR 96-5p.  In Lewis, 125 F.3d at 1441 (11th Cir. 1997), the court reversed the ALJ's finding of no disability, in part because the ALJ relied on a treating physician's report that the claimant could no longer work as a longshoreman when this report was ambiguous as to whether the claimant could do any work, and the physician subsequently wrote a letter saying the claimant was completely disabled.  To require the Commissioner to accept as controlling a statement that a patient is or is not disabled would require the Commissioner to credit the physician not only with knowledge of the patient's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters.  Additionally, a physician's opinion on whether a person is able to work may be colored by such things as the physician's knowledge of local hiring practices, whether there are specific job vacancies, a person's reluctance to do a particular kind of work, and similar matters.  These things are not properly considered by the Commissioner in determining disability.  20 C.F.R. § 404.1566.  For all these reasons, a physician's opinion that his or her patient cannot work or is disabled is not a conclusive

medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.

Finally, the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.  *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).

In this case, the ALJ discounted Dr. Spence's April 28, 2003 opinion that Plaintiff was limited to three hours of standing/sitting in an eight-hour workday and lifting no more than ten pounds (Tr. 27).  The ALJ noted that the opinion was not entitled to "great evidentiary weight because Dr. Spence offer[ed] no explanations as to [Plaintiff's] limitations, his opinion is not supported by objective medical findings, and [it] is contrary to his progress notes on examination which show normal findings (see progress notes dated 11/12/02, 2/18,/02, and 4/23/03)" (*id.*).  In addition, the ALJ explained that Dr. Spence's three-hour standing/sitting limitation is contrary to the other objective medical evidence in the record (Tr. 27).  Finally, the ALJ explained that, while Dr. Spence often noted severe back pain, his records are "devoid of objective findings on examination to support the severity of her condition, but [appear to be] based mostly on [her] subjective complaints" (*id.*).  The ALJ concluded that the record evidence establishes the existence of an underlying medical condition capable of producing some limitations, but "substantial evidence does not support [the] conclusion that the medically determined medical conditions are of such severity that they could reasonably be expected to cause limitations to the extent alleged by" Plaintiff (*id.*).

The ALJ's findings are well supported by the record.  On April 28, 2003, Dr. Spence completed a sedentary requirements checklist (Tr. 373–75).  The checklist indicates that Plaintiff is limited to standing or walking three hours and sitting three hours in a normal eight-hour workday (Tr. 374).  The checklist also indicates that Plaintiff cannot sit for six hours in a normal position (Tr. 373).  Other than selecting the appropriate boxes for these limitations, however, no other information or explanation was provided by Dr. Spence on this form.

Additionally, the limitations are, as noted by the ALJ, inconsistent with Dr. Spence's other records. For example, Dr. Spence's notes from November 12, 2002, indicate that Plaintiff slipped and fell against a microwave cart (Tr. 382). Dr. Spence noted a swollen area on her upper back, but he observed that she appeared in no acute distress and her gait and station were normal, although she walked with a limp (*id.*). He assessed dizziness due to the slip and fall injury and prescribed medication (Tr. 379, 382–83). No other significant problems were noted. On April 23, 2003, Plaintiff presented to Dr. Spence complaining of right leg, knee, and side pain caused by picking up a laundry basket (Tr. 378–79). In relevant part, Dr. Spence assessed shoulder pain and prescribed Lortab and Celebrex (Tr. 376). Again, no other significant problems were noted. Furthermore, Dr. Spence observed Plaintiff after April 28, 2003. In brief, on May 2, 2003, x-rays of Plaintiff's right shoulder showed no signs of acute injury (Tr. 386). On May 22, 2003, Plaintiff returned to Dr. Spence with a rash on her forehead from "pulling weeds" in the garden (Tr. 389–90). General aches and pains were noted but otherwise Plaintiff was essentially normal (Tr. 390). On October 8, 2003, Plaintiff was admitted to the hospital and Dr. Spence noted that Plaintiff was still smoking a pack of cigarettes a day and having up to two drinks a night; he also diagnosed "polysubstance abuse positive for barbiturates" (Tr. 402–04). Dr. Spence observed that Plaintiff was alert and oriented with no limitation on range of motion (Tr. 403). Plaintiff was stabilized on her medications and discharged the following day without any comment on her "limitations" (Tr. 400). Finally, an MRI on November 17, 2003, showed mild cervical spondylosis but was otherwise normal (Tr. 396; Tr. 393–97 (radiologist report of MRI)).

Moreover, the record shows that Dr. Spence treated Plaintiff from October 2002 until November 2003 (Tr. 264–68, 373–404). The April 28, 2003 opinion is the only instance that Dr. Spence limited Plaintiff to standing/sitting three hours in an eight-hour workday (*see* Tr. 373–75).

Furthermore, in addition to being inconsistent with his own records, Dr. Spence's April 28, 2003 opinion is inconsistent with the record as a whole. On April 15, 2002, Plaintiff was examined by Dr. Naeem (Tr. 213–15). He found Plaintiff positive for "off and on chest pain" but noted that she had no shortness of breath, orthopnea, or PND (Tr. 214). He found her heart, lungs, back, and extremities essentially normal, and he noted full range of motion in all of her joints (*id.*). Dr. Naeem opined that "[s]he certainly has multiple ongoing medical problems which require constant medical

attention.  Although, I did not see limitations in her day to day physical activities." (Tr. 215).
Plaintiff presented to emergency room physicians on August 8 and 17, 2002, October 8, 2002, and
November 14, 2002, but no physician made any note regarding Plaintiff's physical limitations (*see*
Tr. 307, 315, 326, 333, 343).  On October 8, 2002, x-rays of her right ribs showed old fractures but
no definite evidence of an acute fracture (Tr. 312).  On May 2, 2003, x-rays of Plaintiff's right
shoulder showed degenerative changes, but no fracture or dislocation, and no sign of an acute injury
(Tr. 386).  An MRI on November 17, 2003 showed mild cervical spondylosis but was otherwise
normal (Tr. 396; Tr. 393–97 (radiologist report of MRI)).    Additionally, Dr. Spence's
standing/sitting and lifting (i.e., ten pounds) limitations are not consistent with other determinations
of Plaintiff's RFC.  Dr. Patterson found that Plaintiff was able to frequently lift or carry ten pounds,
occasionally lift or carry twenty pounds, and she could stand, walk, or sit six hours in an eight-hour
workday (Tr. 235).  Similarly, Dr. Neal found that Plaintiff was able to lift or carry fifty pounds
occasionally and twenty-five pounds frequently, and she could sit, stand, or walk six hours in an
eight-hour workday (Tr. 270).  Accordingly, the ALJ did not err in assigning little weight to Dr.
Spence's opinion because good cause to do otherwise has been shown, and the reasons for the ALJ's
decision to assign little weight to the opinion have substantial support in the record.

Finally, regarding Dr. Spence, Plaintiff argues that if the ALJ did not "believe [that] Dr.
Spence's opinion was based on 'medically acceptable clinical and laboratory diagnostic
techniques,'" the ALJ was "required by the [] regulations to re-contact Dr. Spence for clarification
of his statements" (*id.*) (emphasis in original).  However, because the ALJ properly discounted Dr.
Spence's opinion, he was not required to recontact Dr. Spence.  *See* Goff v. Barnhart, 421 F.3d 785,
791 (8th Cir. 2005) ("Here, the ALJ did not find the doctors' records inadequate, unclear, or
incomplete, nor did [he] find the doctors used unacceptable clinical and laboratory techniques.
Instead, the ALJ discounted the opinions because they were inconsistent with other substantial
evidence.  In such cases, an ALJ may discount an opinion without seeking clarification."); Osborn
v. Barnhart, 194 Fed. Appx. 654, 668–69 (11th Cir. 2006) (noting that the ALJ did not err in failing
to recontact a treating physician for clarification of his report where substantial evidence supported
the ALJ's determination that the claimant was not disabled).  Additionally, although the ALJ is
"bound to make every reasonable effort to obtain from the claimant's treating physician(s) all the

medical evidence necessary to make a determination," the burden is on Plaintiff to prove that she is disabled.  *See* Sellers v. Barnhart, 246 F. Supp. 2d 1201, 1210 (M.D. Ala. 2002).  Thus, the ALJ did not err in failing to recontact Dr. Spence.

      B.      Discounting the Opinion of Dr. Annis

Plaintiff argues that the ALJ failed to explain why he rejected or did not consider the opinion of Dr. Annis (Doc. 19 at 15).  Plaintiff states that on April 11, 2002, Dr. Annis opined that Plaintiff had a limited ability to interact appropriately with strangers and is socially handicapped by her depression and anxiety (*id.*).  Plaintiff further alleges that Dr. Annis opined that Plaintiff would not do well in occupations that require frequent, protracted, or demanding social interaction (Doc. 19 at 15–16).  In light of this evidence, Plaintiff argues the ALJ failed to weigh this opinion, or at the least, failed to explain why his "ultimate RFC [determination] differed so dramatically" (*id.* at 16).  In response, the Commissioner argues that the ALJ considered Dr. Annis's opinion (Doc. 22 at 4).  Further, the Commissioner points out that Dr. Annis's opinion, as a one-time consultative examiner, is entitled to little weight (*id.*).  Thus, the Commissioner asserts that the ALJ did not err in considering Dr. Annis's opinion.

Initially, as noted by the Commissioner, Dr. Annis was indeed a one-time examining physician; thus, his opinion is not entitled to as much weight as that of a treating physician.  *See* Wilson, 734 F.2d at 518; 20 C.F.R. § 404.1527(d); *see also* Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1160 (11th Cir. 2002) (explaining that "[t]he ALJ correctly found that, because [a physician] examined [claimant] on only one occasion, [the one-time examining physician's] opinion was not entitled to great weight").  Nevertheless, the ALJ considered Dr. Annis's opinion and explained that on April 11, 2002, Dr. Annis found Plaintiff to have "depressive disorder, recurrent" (Tr. 22).  The ALJ determined that this mental impairment was "not severe [enough] to impose any significant functional limitations" (Tr. 26).  Moreover, the ALJ explained that Plaintiff was not being treated for mental health issues and was able to work for many years despite her allegations of depression (*id.*).  Further, the ALJ cited to the opinion of Dr. Conger as supportive of his finding that Plaintiff could perform routine jobs and was, at the time of Dr. Conger's examination, working part-time (*id.*).  In conclusion, the ALJ determined that Plaintiff's mental impairments would not prevent her from working (*id.*).

The ALJ's findings have substantial support in the record.  First, the court notes that the record contains evidence that Plaintiff suffered from depression beginning as early as August 1995 (*see* Tr. 256).  For example, on August 29, 1995, Dr. Giraldo, who treated Plaintiff from 1990 until 2002 (*see* Tr. 242–63), diagnosed anxiety/depression and prescribed Zoloft (Tr. 256).  In March 1999, Dr. Arunakul prescribed Wellbutrin to treat Plaintiff's depression in connection with her attempt to stop smoking (*see* Tr. 182).  But during this time period, 1990 to 2000, the record reflects that Plaintiff was employed as a waitress, cook, housekeeper, and oyster shucker (Tr. 36–42, 63–64, 124 (work history report), 140 (same)).  During the time Plaintiff was performing substantial gainful activity, she cannot be disabled under the Regulations.  *See* 20 C.F.R. § 404.1520(a)(4)(i), (b).[7] Second, in April 2000, Dr. Himadi, another psychologist, rendered an opinion very similar to Dr. Conger's (*see* Tr. 277–90).  Dr. Himadi opined that Plaintiff's impairments were not severe and diagnosed her with depressive disorder, not otherwise specified (Tr. 277, 280).  He found her functional limitations to be "mild" for restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace; and "none" in episodes of decompensation (Tr. 287).  Dr. Himadi opined that "[t]here appear to be no significant psychological issues precluding [Plaintiff] from working" (Tr. 289).  In addition, in October 2001 Plaintiff returned to Dr. Giraldo with complaints of depression because she was going through a divorce (Tr. 249).  Dr. Giraldo diagnosed her with severe depression, situational, and tobacco abuse, and he prescribed Prozac (*id.*).  In April 2001, Dr. Naeem noted Plaintiff's history of depression but opined that while "[s]he certainly has multiple ongoing medical problems which require constant medical attention . . . I did not see limitations in her day to day physical activities" (Tr. 215).  Then, in April 2002 and contrary to Dr. Annis's opinion from the same month, Dr. Conger stated that Plaintiff was mentally capable of performing routine jobs and was currently working part-time (Tr. 228).  He further stated that although she may experience some depression related to her condition, she can relate in a socially appropriate manner and displays an adequate mental status (*id.*).  Later, in October 2002, Dr. Gwinn's impression included the observation that Plaintiff suffered from depression (Tr. 296).  Dr. Gwinn also reported, however, that Plaintiff had

---

[7]The ALJ determined that Plaintiff was not performing substantial gainful activity in 2001 because her income fell below the primary guideline amount for 2001 (*see* Tr. 21).

not been taking her Prozac and recommended that Plaintiff's Prozac be restarted because "she seems certainly anxious" (*id.*).  "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling."  Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (quoting Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987) (footnote omitted)). Furthermore, failure to seek treatment,[8] as the ALJ noted (*see* Tr. 26), is another valid reason to discount Plaintiff's allegations of debilitating depression and anxiety.  *See* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to the objective medical evidence, it is proper for the ALJ to consider a plaintiff's failure to seek treatment);  *see also*  Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) (failure to seek medical treatment for a long time during a claimed period of disability tends to indicate tolerable pain).  Third, in April 2003, Dr. Spence diagnosed depression and switched Plaintiff from Prozac to Lexapro because she complained that the Prozac was not working (Tr. 376).  Dr. Spence also noted that Plaintiff did not have any non-exertional impairments, including neurological or psychological restrictions, associated with pain, fatigue, or intelligence that substantially restricted Plaintiff's ability to function (*id.*).  Then, in October 2003, Dr. Spence observed that Plaintiff had no signs of depression or anxiety (Tr. 403).  He also noted positive tests for polysubstance abuse (barbiturates), THC, and tricyclics (Tr. 399).  Plaintiff was discharged with no prescription for depression medication (*see* Tr. 400).  Thus, Dr. Annis's opinion conflicts with Dr. Spence's opinion; the ALJ identified this conflict and remarked that Dr. Spence's opinion "shows that her condition has improved" (*see* Tr. 27).

In conclusion, the ALJ did not err in considering the opinion of one-time consulting examiner Dr. Annis.  The ALJ articulated sufficient reasons, with substantial support in the record, for discounting Dr. Annis's opinion.

C.      Determination of Plaintiff's RFC and Ability to Return to Past Relevant Work

Plaintiff argues that the ALJ improperly determined her RFC (Doc. 19 at 15, 18–20).  First, Plaintiff alleges the ALJ failed to properly consider her diagnosis of "recurrent major depressive disorder" and erred in failing to find that her depression was a severe impairment (Doc. 19 at 15).

---

[8]The court notes that Plaintiff has continuously been advised to stop smoking (*see, e.g.*, Tr. 179, 193, 204–05, 246, 256, 402–04).  More recently, doctors have also advised Plaintiff that she should start a low-fat diet to control her obesity (Tr. 205, 402).

In particular, Plaintiff contends that the ALJ should have limited Plaintiff's RFC based on her "'severe' major depressive disorder" (*id.*). Second, regarding physical abilities, Plaintiff argues that the ALJ failed to discuss Plaintiff's ability to perform sustained work activities in an ordinary work setting and describe the maximum amount of each work-related activity Plaintiff could perform, based on the evidence in the record (*id.* at 18). Plaintiff states the ALJ's determination that she could perform light work did not result after "any meaningful discussion of which findings, if any, supported" the ALJ's determination (*id.* at 19). Essentially, Plaintiff argues that the ALJ's determination of her RFC is not supported by the record (*see id.*).

In response, the Commissioner argues that the RFC determination is supported by substantial evidence (Doc. 22 at 7–8). The Commissioner points out that the ALJ noted that Plaintiff did not receive mental health treatment and performed substantial gainful activity for many years despite her depression (*id.* at 7). In addition, the Commissioner argues that substantial record evidence supports the ALJ's finding that Plaintiff had no significant work-related limitations from COPD (*id.*). Further, the Commissioner argues that the VE's testimony supports the ALJ's determination that Plaintiff was not disabled because she could return to her prior employment (*id.*).

In this case, the ALJ first determined that Plaintiff's conditions, including "coronary atherosclerotic heart disease, hypertension, [recurrent] major depressive disorder, [] chronic neck and back pain, status post left rib contusion, degenerative disc disease and status post bronchitis," are severe within the meaning of the Regulations but not severe enough to meet or medically equally a listed impairment (Tr. 25–26). Next, the ALJ found that Plaintiff's testimony of disability was not totally credible (Tr. 26). Specifically, the ALJ determined that the objective medical evidence did not demonstrate that Plaintiff was in disabling pain (*id.*). The ALJ explained that Plaintiff indicated her pain was five to six on a ten-point scale, but the record demonstrates that Plaintiff was treated conservatively for shoulder and arm pain (*id.*). Furthermore, as discussed more fully below, MRIs showed only moderate defects and "minimal indentation or pressure on the spinal cord," and x-rays did not show any acute injuries (*id.*). The  ALJ also explained that Plaintiff had attempted only conservative treatment and had often not followed up with her doctors and sometimes failed to take her medications (*id.*). This finding is well supported by the record, as detailed *supra*. With respect to her mental limitations, the ALJ acknowledged Plaintiff's complaints of "severe" depression (*id.*).

The ALJ also found that Plaintiff's recurrent major depressive disorder was not severe enough to impose any significant functional limitations (*id.*). The ALJ cited to Dr. Conger's records and explained that Plaintiff's activities of daily life show that was able to function despite her depression (*id.*). The ALJ also explained that in October 2003, Dr. Spence reported that Plaintiff had a positive drug screen, showed no signs of depression, and was noncompliant with her prescribed treatment (Tr. 26–27). The ALJ referenced Dr. Spence's opinion that Plaintiff's condition had improved relative to his prior treatment (*see* Tr. 27). Finally, the ALJ noted that Plaintiff was not receiving treatment for her mental and emotional problems and was able to work despite her depression (Tr. 28). Accordingly, the ALJ found that Plaintiff retained the RFC to do light work (Tr. 28).[9]

Determination of RFC is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite her impairments. *See* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997). As stated in 20 C.F.R. § 404.1545(a), it is the most a claimant can still do despite her limitations. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). Although the RFC determination is a medical question, it is not based only on "medical" evidence (that is, evidence from medical reports or sources); rather, an ALJ has the duty, at step four, to assess RFC on the basis of all the relevant, credible evidence of record. *See* <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1238 (11th Cir. 2004); <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); <u>Dykes v. Apfel</u>, 223 F.3d 865, 866–67 (8th Cir. 2000) (per curiam) (RFC is a determination based upon all the record evidence, but the record must include some medical

---

[9]Light work is defined in 20 C.F.R. § 404.1567(b) as follows:
Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

evidence that supports the RFC finding).  *See also* 20 C.F.R. § 404.1545; Social Security Ruling (SSR) 96-8p.

Plaintiff's argument that the ALJ should have found her RFC limited by her diagnosis of "recurrent major depressive disorder" is simply another way contesting the ALJ's failure to adopt Dr. Annis's opinion.  For the reasons set forth *supra*, the ALJ properly considered Dr. Annis's opinion and determined that his diagnosis of "major depressive disorder" did not impose any type of limitation or restriction on Plaintiff's ability to do basic work activities (Tr. 28).  In particular, the ALJ explained that Dr. Annis's opinion was contradicted by Dr. Conger's opinion and by Dr. Spence's opinion and records; further, the ALJ found that Plaintiff's complaints of disabling depression and anxiety were not supported in light of Plaintiff's testimony about her daily activities.

Next, Plaintiff argues that the ALJ's RFC determination is not supported by the record (Doc. 19 at 18–19).  In determining Plaintiff's RFC to do light work, the ALJ explained that MRIs and x-rays shown only mild, non-acute, injuries (Tr. 26).  Plaintiff was treated conservatively, often failed to follow up with her doctors, and sometimes failed to take her medications (*id.*).  In particular, the ALJ cited to Dr. Spence's October 2003 records showing that Plaintiff had a positive drug screen, showed no signs of depression, was noncompliant with her prescribed treatment, and had improved relative to her prior visits (*see* Tr. 26–27).

Despite Plaintiff's argument to the contrary, this court concludes that the ALJ's determination of Plaintiff's RFC (which was based in part on MRI and x-ray results) is well supported by the record.  In April 1998, an MRI of Plaintiff's cervical spine showed an extradural defect at C6-7 on the left side consistent with bony bar formation and cervical spondylosis (Tr. 371).  An MRI of Plaintiff's lumbar spine showed no evidence of disc herniation, minimal bulging of the L3-4 discs, and mild facet arthropathy bilaterally at the L4-5 and L5-S1 levels (Tr. 372).  A May 2000 chest x-ray showed no cardiac, mediastinal, or bony thoracic abnormalities, and Dr. Arunakul noted that Plaintiff's lungs remained clear (Tr. 365).  In late June 2001, Plaintiff was hospitalized for chest pain, but tests showed that her cardiac isoenzymes were negative, and her EKGs were essentially normal  (Tr. 196).  Upon discharge, Plaintiff was free of chest pain, and her vital signs were stable (*id.*).  On August 16, 2001, Dr. Maner noted that Plaintiff's left atrial dimensions were normal; the mitral and tricuspid valves were anatomically unremarkable; the left ventricular

dimensions, wall thickness and systolic function were normal; and there was an unremarkable doppler of the pulmonic valve with no pericardial effusion (Tr. 202).  On August 17 and 24, 2001, pharmacological nuclear stress testing results were within reasonable limits of normal (Tr. 201).  In February 2002, a chest x-ray showed old rib fractures, deformities, and possibly "an occult acute fracture, but [no] pulmonary contusion, pneumothorax, or hemothorax" (Tr. 358).  On April 11, 2002, Dr. Annis noted that Plaintiff had no apparent difficulties in posture, gait, and coordination (Tr. 210).  Later in April 2002, Dr. Naeem found her heart, lungs, back, and extremities to be essentially normal, with full range of motion in all of her joints (Tr. 214).  Dr. Naeem opined that her medical problems would not impose limitations in her day to day physical activities (Tr. 215).  Near the end of April 2002, Dr. Conger found Plaintiff mentally capable of performing routine jobs and noted that was currently working part-time (Tr. 228).  In September 2002, Dr. Spence again noted that Plaintiff had a normal EKG (Tr. 268).  In October 2002, x-rays of Plaintiff's right ribs showed no definite evidence of an acute fracture (Tr. 312).  In November 2002, Dr. Spence observed that Plaintiff appeared in no acute distress, and her gait and station were normal, although she walked with a limp due to a recent slip and fall (*see* Tr. 382).  In April 2003, Dr. Spence noted that Plaintiff had no non-exertional impairments, including neurological, psychological, allergenic, respiratory, or environmental restrictions associated with pain, fatigue, or intelligence that would have substantially restricted Plaintiff's ability to function (Tr. 373). On May 2, 2003, x-rays of Plaintiff's right shoulder showed degenerative changes, but no fracture or dislocation and no sign of any acute injury or active disease (Tr. 386). Finally, an MRI on November 17, 2003 showed mild cervical spondylosis but was otherwise normal (Tr. 396; Tr. 393–97 (radiologist report of MRI)).  Thus, the record supports the ALJ's findings regarding Plaintiff's physical ability to do light work.

Furthermore, in evaluating a claim of disability, the ALJ may properly consider the claimant's daily activities.  *See* Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i).  Plaintiff's own testimony supports the ALJ's determination that she could perform light work.  Regarding her daily activities, Plaintiff testified that she can walk "around the block," which takes thirty minutes, and she does this once a week for exercise (Tr. 43).  She can lift up to fourteen pounds (Tr. 44).  She does "a little bit" of housework, including some cooking and dusting (Tr. 52).  In addition, as the ALJ noted (*see* Tr. 26), she also goes to bingo, shops, drives,

sometimes goes to the movies, and goes fishing with her husband twice a year (Tr. 52–54).  Further, the record reflects that Plaintiff enjoys gardening and camping, as reported to her physician in July 2001 (Tr. 204), and that she got a rash from gardening in May 22, 2003 (*see* Tr. 390).  She also reported moving a five-gallon bucket of ice in February 2002 and moving furniture in October 8, 2002 (*see* Tr. 315, 354).  Plaintiff claims that she does not have the RFC to perform light work, but her daily activities are inconsistent with her claims.  *See* <u>Macia</u>, 829 F.2d at 1012; 20 C.F.R. § 404.1529(c)(3)(i).

Finally, based on Plaintiff's RFC to perform light work, the ALJ determined that she could return to her past relevant work as a short-order cook, cashier checker, waitress, and counter attendant/server (Tr. 28).  The ALJ explained that at the hearing a VE characterized Plaintiff's former work as follows: cleaner (medium unskilled work); cook (medium skilled work); waitress (light unskilled work); cashier checker (light unskilled work); short-order cook (light semi-skilled work); counter attendant/server (light semi-skilled work); and kitchen worker/helper (medium unskilled work) (*id.*).[10]  Assuming an individual of the same age, education, past relevant work experience, and RFC as Plaintiff, who could sit/stand for six hours in an eight-hour workday, lift twenty pounds occasionally and ten pounds frequently, but who could not work around heights, the ALJ explained that the VE testified that such a person (Plaintiff) could return to her past relevant work as a short-order cook, cashier checker, waitress, and counter/attendant/server, all of which are "light" (*id.*).  The ALJ also noted that, in addition to the limitations in the hypothetical above, if an

---

[10]The ALJ noted that the jobs set out above are defined in the U.S. Department of Labor, DICTIONARY OF OCCUPATIONAL TITLES (4th ed. 1991) (hereinafter "DOT").  The DOT definition of light work is comparable to the definition under the Regulations  (*see* n.9, *supra*):

> Light Work - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.

*See* DOT, *supra* note 9, at Appx. C at IV(c).  In relevant part, the DOT defines short-order cook, cashier checker, waitress, and counter attendant/server as having light work strength requirements.  *See id.* at ## 313.374-014 (short-order cook); 311.472-010 (cashier-checker); 352.677-018 (waitress); 311.677-014 (counter-attendant/server); *see also* Tr. 63–66 (testimony of the VE identifying the same DOT numbers).

individual was further limited to sitting six hours and standing up to four hours in an eight-hour workday, and lifting no more than ten pounds, that the VE testified that such a person (again, Plaintiff) could return to her past relevant work as a cashier and short-order cook, both of which are "light" (*id.*).[11]  Accordingly, the ALJ found that Plaintiff was not disabled because she could return to her past relevant work (Tr. 28–29).

"Past relevant work" is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."  20 C.F.R. § 404.1560(b)(1).  Plaintiff does not dispute the ALJ's findings concerning her prior employment, and the record supports the ALJ's determination of Plaintiff's past relevant work and the VE's characterization of her work.  Thus, because the ALJ's finding that Plaintiff could perform light work is substantially supported by the record, and the jobs to which he found Plaintiff could return were properly characterized as "light," the ALJ did not err in finding that Plaintiff was not disabled because she could return to her prior relevant employment as a short-order cook, cashier check, waitress, and counter attendant/server.  *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f); *see also id.* § 404.1560(b).

---

[11]In making this finding, the ALJ's opinion lists only "cashier and cook" (Tr. 28).  It is clear, however, from the opinion that "cook" means "short-order cook" and "cashier" means "cashier checker" (*see* Tr. 29 (listing the ALJ's findings as short-order cook and cashier checker)).

## VI.     CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Based upon the foregoing, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Michael J. Astrue is substituted for Jo Anne B. Barnhart as Defendant.

And it is respectfully **RECOMMENDED**:

That the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 27th day of July 2007.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**